UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

KIMBERLANA ELKINS

                                     CIVIL ACTION

VERSUS

                                     NO. 18-1035-JWD-EWD

JOE EDWARD BRADSHAW, ET AL.

## RULING AND ORDER

This matter comes before the Court on a number of interrelated motions. First, Plaintiff Kimberlana Elkins ("Plaintiff" or "Elkins") has filed a *Motion To For [sic] Declaratory Judgment* ("*Motion for Declaratory Judgment*") (Doc. 131), asking the Court to declare that the confidential high/low settlement agreement which she entered into with Defendants Joe Bradshaw ("Defendant Bradshaw" or "Bradshaw") and GEICO Casualty Company ("Defendant GEICO" or "GEICO") (collectively, "Defendants") is invalid in sum or in part. (Doc. 131 at 1.) Defendants oppose this motion. (Doc. 140.) Plaintiff has also filed *Plaintiff's Alternative Motion for Relief from Jury Verdict for New Trial Pursuant to FRCP 59(a)* ("*Motion for New Trial*") (Doc. 133). Defendants likewise oppose this motion. (Doc. 139.) In addition, Bayou Medical Management, PPO LLC ("Bayou Medical Management" or "BMM") has filed a *Motion to Intervene on Behalf of Bayou Medical Management, Preferred Provider Organization, LLC* ("*Motion to Intervene*") (Doc. 156), which Defendant GEICO opposes. (Doc. 150.) Finally, Defendant GEICO has filed a *Motion to Enforce Settlement* (Doc. 168), asking the Court for an order enforcing the high/low settlement agreement. Plaintiff opposes this motion, (Doc. 171), as does Bayou Medical Management, (Doc. 170).

## I.    BACKGROUND

This action stems from a trial involving an automobile crash between Plaintiff and Defendant Bradshaw that occurred on March 31, 2017. (Doc. 109 at 4.) Both were insured. (*Id.* at

1

4–5.) Bradshaw was insured by GEICO. (*Id.* at 5.) A four-day jury trial was held beginning on October 18, 2021. (Docs. 117, 121.) On October 22, 2021, the jury returned a verdict apportioning liability/fault as follows: 55% to Defendant Bradshaw and 45% to Plaintiff. (Doc. 124 at 2.)

During the trial, the parties signed a high/low settlement agreement, setting the upper and lower damages that could be awarded to Plaintiff. (Doc. 131-2.) After the jury returned their verdict and judgment was entered, Plaintiff filed this *Motion for Declaratory Judgment*, asking the Court to vacate that agreement. (Doc. 131.) She also moved for a new trial. (Doc. 133.)

In March 2023, Bayou Medical Management moved for leave to file a motion to intervene in this matter. (Doc. 148.) The Court granted the motion for leave to file without ruling on the merits of the motion to intervene. (Doc. 151.) Defendant GEICO filed a motion to dismiss the motion to intervene, arguing that Bayou Medical Management had not properly served Defendant. (Doc. 158 at 1.) The Court denied this motion, again without ruling on the merits of the motion to intervene. (Doc. 167.)

Also in March 2023, Defendant GEICO filed a *Notice to Court of Death of Joe Edward Bradshaw*, informing the Court that Defendant Bradshaw had passed away on July 2, 2022. (Doc. 149 at 1.)

In April 2025, GEICO filed a motion to enforce the settlement agreement (Doc. 168), which both Plaintiff and Bayou Medical Management oppose. (Docs. 170, 171.)

## II.    MOTION FOR DECLARATORY JUDGMENT (DOC. 131)

### A.    Parties' Arguments

#### a.    *Plaintiff's Motion for Declaratory Judgment* (Doc. 131)

According to Plaintiff, on October 22, 2021, "Counsel for Defendant GEICO confected a napkin agreement which purported to be a CONFIDENTIAL HIGH/LOW SETTLEMENT

AGREEMENT" ("the Agreement"). (Doc. 131-1 at 1.) Although "Bradshaw did not sign the document, the other parties and counsel did sign the document." (*Id.*) Plaintiff argues that this agreement is unenforceable because there was no true meeting of the minds. (*Id.*) She asserts that "there was no way that the parties could have known that the jury *voir doir* [sic] . . . was not answered truthfully under oath[,]" for which she provides no evidence. (*Id.*) She further contends that the verdict is against the weight of the evidence, again providing no support for this assertion. (*Id.*) Plaintiff argues that she and her counsel would not have signed this agreement "had the Plaintiff known of the proclivity of the Jury to decide the case apparently disregarding the jury charges and the evidence[.]" (*Id.* at 1–2.)

Plaintiff contends that the contract "lead[s] to absurd consequences as the Jury did not have evidence to find that Ms. Elkins was 45% at fault." (*Id.* at 2.) She further argues that there was no clear meeting of the minds, asserting that the Agreement applied only to GEICO, not to Defendant Bradshaw. (*Id.* at 3.) Plaintiff then attempts to relitigate the case, arguing that the jury was wrong in believing Bradshaw. (*Id.* at 3–7.) Plaintiff admits that she "has no better explanation of why the jury found as they did than to listen to Mr. Bradshaw say he didn't think it should all be his fault." (*Id.* at 7.) In addition, Plaintiff maintains that "the general damage award of $20,000.00 for pain and suffering and $20.000.00 for mental anguish" is "grossly under value[.]" (*Id.*) She disagrees with the jury's choices of which expert witnesses to believe. (*Id.* at 7–8.)

Plaintiff further argues that the Court "should grant the limited Motion to void any waiver of any associated entitlements to a verdict in favor of Plaintiff, namely interest, costs and expenses." (*Id.* at 8.) She contends that this suit "began life in the 19th Judicial District Court where filing fees, etc. were incurred." (*Id.*) Plaintiff asserts that the high/low agreement "uses similar language in addressing 'costs, expenses, liens, interest' when the verdict falls above or

below the High/Low limits and specifically does not use the word 'waive' in those eventualities."
(*Id.*) On the other hand, she claims, "when the verdict is rendered in value between $150,000.00
and $1,400,000.00, the Agreement written by Defendants does contain the word 'waive' in relation
to recovering 'costs, expenses, liens, interest, etc.'" (*Id.*) According to Plaintiff, such waiver was
contemplated for verdicts below $150,000, but the "partial sentence containing the word [waiver]
near the bottom of page 1 of the Agreement was 'scratched out' and initialed[.]" (*Id.* at 8–9.) She
states "[w]ords have meanings[]" and argues that defense counsel "sought to treat the scenario
where the jury verdict fell between the high and low extremes differently than when the extremes
were invoked[,]" which she argues is demonstrated by the scratched out word. (*Id.* at 9.)

   Plaintiff's motion then states, "Counsel understands the great weight given the verdict of a
jury, the fact-finder in the case at hand." (*Id.*) She admits that the "parties freely contracted in
High/Low Settlement Agreement." (*Id.*) However, she argues that the Agreement "is conditioned
. . . on the verdict, in the least, being supported by the evidence." (*Id.*) She further argues that "[a]ll
post-trial relief is thwarted by the Agreement, which in the extreme, could yield a verdict with 95%
of fault on the plaintiff-leading motorist and a damage award of $2,000,000.00, which in our
setting, would result in a Judgment of $100,000.00 and raised to the Low of $150,000.00." (*Id.*)
Plaintiff contends that this "could be completely incredulous to all who saw or heard it, with the
exception of the jurors[.]" (*Id.*) Plaintiff contends that because she "could not contemplate being
held 45% at fault" in this action or "the unreasonable general damage awards and lack of future
medical or loss of any future wage or loss of earning capacity[,]" this "agreement did not confect
a meeting of the mind [sic] of the parties." (*Id.* at 9–10.)

> b.    *Defendants' Opposition to the Motion for Declaratory Judgment* (Doc. 140)

Defendants, on the other hand, argue that it was Plaintiff who initially sought the Agreement when, on the evening of October 21, 2021, "Plaintiff's counsel sent a text to counsel for Defendants proposing a 'high-low' agreement of $275,000.00 (low) and $1.4 million (high)." (Doc. 140 at 1.) Defendants made a counter-proposal on October 22, 2021, "of $150,000.00 (low) and $1.4 million (high)." (*Id.* at 2.) Defense counsel "explained that the agreement was for everything and whatever the outcome, the amount of the jury verdict is what would be paid and would be inclusive of all costs, expenses, liens, interest, *et cetera*." (*Id.*) According to Defendants, "[c]ounsel for Defendants also noted that if the 'low' was triggered, or if the amount came in below the amount offered in Offer of Judgment dated June 23, 2021, the Defendants would forego their rights to any relief to which they may be entitled under Rule 68." (*Id.*) Defendants assert that "Plaintiff's counsel did not express any misunderstanding of the terms and accepted on behalf of her client." (*Id.*) The parties then "memorialized the agreement on two (2) pages, with signature lines for Plaintiff, GEICO's representative, and all counsel, which was signed." (*Id.*)

Defendants acknowledge that "Mr. Bradshaw was not present for the trial by leave of the Court and was (and has always been) represented by the undersigned." (*Id.*) They argue that the lack of signature from Bradshaw does not mean there was no "meeting of the minds" because "Mr. Bradshaw's signature on the agreement was <u>not</u> necessary[.]" (*Id.*) They argue that "a) the agreement secured a release of claims against him without the need to make any personal contribution to the payment required under the agreement; and, b) by operation of the express language of the GEICO policies at issue, GEICO retained the sole authority by which to enter into a settlement agreement (*i.e.*, Mr. Bradshaw's consent was unnecessary)." (*Id.* at 2–3.) Defendants

assert that Plaintiff's argument "runs contrary to the Civil Code Articles on compromise/settlement and reams of Louisiana jurisprudence, as well as common sense." (*Id.* at 3.)

Furthermore, Defendants argue that "Plaintiff's Motion ignores 'black letter' Louisiana law regarding transaction and compromise, as well as what constitutes a settlement and the presumption that one has read and understands a document they [sic] have signed." (*Id.* at 3.) They point to Article 3701 *et seq.* of the Louisiana Civil Code to argue that this agreement "meets the requirements of Louisiana law as to an enforceable settlement agreement." (*Id.*) Defendants argue that Louisiana courts "have held parties to the terms of contracts that they admitted they never reviewed prior to signing them and where they claimed the provisions of the contract at issue had not been pointed out or explained to them." (*Id.* at 3–4.)

In addition, Defendants argue that the language of the Agreement is not ambiguous but "is clear that regardless of the jury verdict: whether the 'low' or 'high' was triggered, or whether the verdict came in between those numbers, the amount of the jury verdict would constitute the entirety of what would be paid to the Plaintiff." (*Id.* at 4.) Defendants claim that this means "[t]here would be no recovery of costs, interest, liens, *et cetera*, by anyone, regardless of the amount awarded." (*Id.* (emphasis omitted.)) They contend that all parties "expressly waived their rights to any post-judgment relief other than for the enforcement of the agreement[,]" which Defendants argue makes this motion "unquestionably contrary to the agreement[.]" (*Id.* (emphasis omitted).)

Defendants note that "no one 'knows' what a jury (or finder of fact) is going to do after a presentation of evidence at trial, and no one 'knew' what the jury was going to do in this case. It is the inherent uncertainty of that outcome that results in settlements[.]" (*Id.*) They argue that this is "nothing more than 'buyer's remorse[,]'" and assert that Plaintiff's argument that "she made a

'bad bargain'" is not grounds "for the Court to undo a *contract* she <u>signed</u> (along with her counsel)." (*Id.* at 4–5.)

Finally, Defendants argue that this motion "is clearly without a good faith foundation and is meritless." (*Id.* at 5 (emphasis omitted).) They therefore seek sanctions. (*Id.*)

    *c.*    *Plaintiff's Reply* (Doc. 138)

In reply, Plaintiff argues again that the high/low agreement is founded on the jury verdict and cannot be enforced absent a valid jury verdict. (Doc. 138 at 2.) She repeats that there was no valid jury verdict because the jury "had no basis in fact or law to accept" Defendants' version of events. (*Id.* at 3–4.) Plaintiff's argument relies, yet again, on relitigating the case. (*Id.* at 4–5.) She argues that the jury was incorrect and that "[t]he Court simply cannot let these eight (8) jurors be the final arbiter of facts." (*Id.* at 5–6.)

**B.**    **Legal Standards**

"Louisiana jurisprudence has a 'strong policy favoring compromise agreements and finality of settlements.'" *Thompson v. Hebert*, 23-284 (La. App. 3 Cir. 12/13/2023), 377 So. 3d 912, 920 (quoting *Brown v. Drillers, Inc.*, 93-1019 (La. 1/14/94), 630 So. 2d 741, 757). The law "does not sanction the solemn acts of contending parties settling their disagreements being lightly brushed aside, unless there be present evidence of bad faith, error, fraud, etc." *Id.* (quoting *Beck v. Cont'l Cas. Co.*, 145 So. 810, 811 (La. App. 2 Cir. 1933)).

**C.**    **Analysis**

First, the Court addresses the question of whether the Confidential High/Low Settlement Agreement (Doc. 131-2) between the parties is valid. If so, the Court will not set it aside absent "present evidence of bad faith, error, fraud, etc." *Thompson*, 377 So. 3d at 920 (quoting *Beck*, 145 So. at 811). The Agreement defines the parties as Kimberlana Elkins, Joe Edward Bradshaw, and

GEICO Casualty Company. (Doc. 131-2 at 1.) The Agreement states that "[t]he parties have agreed to a 'high/low' agreement regarding the verdict of the jury in the trial of this matter." (*Id.*) It defined the low, "which will apply to any verdict <u>under</u> $150,000.00[,]" as $150,000.00. (*Id.*) It defined the high, "which will apply to any verdict above $1,400,000.00[,]" as $1,400,00.00." (*Id.*) The Agreement stated that "[a]ny verdict below the 'low' will be paid by GEICO in the amount of $150,000.00 . . . inclusive of any costs, expenses, liens, interest, etc." while "[a]ny verdict above the 'high' will be paid by GEICO in the amount of $1,400,000.00 . . . inclusive of any costs, expenses, liens, interest, etc." (*Id.*) All parties waived "any right to recover costs, expenses, liens, interest, etc. for any verdict between the high/low amounts." (*Id.*) Likewise, the parties "waive[d] all rights to:" "appeal[,]" "motion for new trial[,]" "jnov[,]" "additur/remittitur[,]" "or any post judgment relief other than the right to enforce this agreement." (*Id.* at 2.) It was signed by Plaintiff and by counsel for all parties. (*Id.*) The Agreement did not contemplate that Defendant Bradshaw would pay any sum. (*See id.* at 1–2.)

Plaintiff objects to the absence of Defendant Bradshaw's signature. However, Louisiana courts have previously upheld agreements between plaintiffs and auto insurer defendants, without the individual driver defendant. *See Thompson*, 377 So. 3d at 914, 922–23 (upholding a high/low agreement entered into by the plaintiff and the auto insurer, releasing all claims against all defendants). As in this matter, the agreement in *Thompson* contemplated the insurer, not the driver, paying all agreed-upon sums to the plaintiff. *Id.*; *see also Randall v. Martin*, 03-1311 (La. App. 5 Cir. 02/23/2004), 868 So. 2d 913, 916–918 (finding a release of claims signed by the plaintiff and the insurance adjuster to be an enforceable agreement under Louisiana law); *Boudreaux v. LeBlanc*, 517 So. 2d 911, 912, 914 (La. App. 3 Cir. 1987) (upholding a compromise and release negotiated exclusively between the plaintiff and the insurance adjuster).

Plaintiff's other arguments for invalidating the Agreement are no more availing: Nearly all of them argue, in essence, that she would not have entered this agreement had she known what the jury was going to do. (Doc. 131-1 at 1–2.) All settlement agreements are entered into without knowing what the jury is going to do. Many parties might wish, in a hypothetical alternative universe, that they had not entered into the Agreement because of the jury's ultimate actions. This wish does not provide grounds to invalidate the Agreement. Plaintiff's *Motion for Declaratory Judgment* here begins to overlap with her *Motion for New Trial*, which the Court will address separately. She argues that she would not have entered into the Agreement had she known that the jury would disregard the jury charges and the weight of the evidence in reaching its conclusion, or that the foreperson had allegedly misled the attorneys in *voir dire*. (*Id.* at 3–9.)

Plaintiff has not asserted that Defendants engaged in "error, fraud, duress, or undue influence in the confection and execution" of this agreement. *Joseph v. Huntington Ingalls, Inc.*, 18-2061 (La. 1/29/20), 347 So. 3d 579, 591. She instead argues that the *jury* engaged error and fraud or, at most, that Defendant Bradshaw engaged in fraud in his testimony before the jury. (Doc. 131-1 at 2, 4–7, 9.) But this is not what Louisiana law contemplates when it bars "error, fraud, duress, or undue influence in the confection and execution" of this agreement. *Joseph*, 347 So. 3d at 591. Plaintiff has provided no evidence that Defendants committed any wrongdoing in the confection and execution of the Agreement.

As such, the Court will not invalidate the Agreement.

## III. MOTION FOR NEW TRIAL (DOC. 133)

In the Agreement, Plaintiff waived her rights to appeal, motion for new trial, JNOV, additur/remittitur, or any post-judgment relief other than the right to enforce the Agreement. (Doc.

131-2 at 2.) However, for the sake of completeness, the Court finds each of Plaintiff's arguments in her motion for a new trial to be without merit.

### A.    Parties' Arguments

#### a.    *Plaintiff's Motion for New Trial* (Doc. 133)

As an alternative to her *Motion for Declaratory Judgment* (Doc. 131), Plaintiff has also filed a *Motion for New Trial* (Doc. 133). She argues that "first, the jury foreman did not answer *voir doir* [sic] questions in a manner that allowed for the Plaintiff to assess the jury foreman or to use the information to attempt to rehabilitate"; next, that "there was a systematic exclusion of persons of color from jury service"; third, that "there was misconduct by opposing counsel in the introduction of testimony which wrongfully interjected evidence of Medicaid immediately prior to deliberations of the Jury"; and fourth, that "the clear weight of the evidence showed serious error on division of liability to Ms. Elkins in a rear end car accident." (Doc. 133-1 at 1.)

Plaintiff argues that during *voir dire*, although the Court asked prospective members of the jury if they had previously been involved in litigation, "there was no mention of any other litigation by the jury foreman." (*Id.* at 2.) The foreperson was Black, but Plaintiff takes issue with the fact that she was "the only African American on the jury[.]" (*Id.* at 3.) Plaintiff argues that the panel of potential jurors was not reflective of the racial demography "of the parishes making up the Middle District of Louisiana[.]" (*Id.* at 4.) Plaintiff argues that this juror "had not responded to a question on *voir dire* seeking to elicit information about previous lawsuits, in particular, the juror had filed for bankruptcy protection less than a year ago and had multiple cases that went undisclosed." (*Id.* at 3.) According to Plaintiff, "the juror's failure to disclose money issues that were discovered through the bankruptcy case filed . . . denied Ms. Elkins the right to an impartial jury." (*Id.* at 4.)

Plaintiff next contends that "[i]ntroduction of irrelevant and inadmissible evidence of Medicaid through the reading of the testimony of Dr. Jackson during the trial was prejudicial error that was read immediately prior to the retirement of the Jury should be reversed." (*Id.*) Plaintiff argues that this information was subject to Louisiana's law of privilege under the collateral source rule. (*Id.* at 4–5.) Although Plaintiff acknowledges that the Court had previously instructed the parties to confer and redact the depositions so that only the relevant portions would be shared with the jury, she does not explain in her motion whether the evidence she objects to was read despite agreed-upon redactions or if it was not redacted. (*Id.* at 5.) Plaintiff also acknowledges that she did not object to Dr. Jackson's testimony at trial, but she argues that this was because of the Court's previous instructions. (*Id.* at 6.) She argues that she "had no need [to] renew an objection or offer proof to preserve a claim of error for appeal[.]" (*Id.*) Plaintiff contends that references to Medicaid were prejudicial, particularly because the jury foreperson was a medical coder. (*Id.* at 7.)

In addition, Plaintiff argues that the evidence did "not support an award of 45% fault[]" and that "there was uncontroverted evidence of injury to the Plaintiff." (*Id.* at 2.) She asserts that the "damages were abusively low." (*Id.* at 7.) She argues that "there was no reason" for the jury to award liability as it did. (*Id.* at 9.) As such, she urges the Court to grant her motion for alternative relief. (*Id.* at 10.)

> b.    *Defendants' Opposition to the Motion for New Trial* (Doc. 139)

In opposition, Defendants again argue that this motion is barred under the high/low agreement. (Doc. 139 at 1.) Even absent the high/low agreement, however, Defendants assert that Plaintiff's argument is meritless. (*Id.*) First, Defendants point out that Plaintiff "not[ed] the racial composition of the venire" at the beginning of jury selection, at which point "[t]he Court noted that there was no racial bias in the manner by which the venire is selected and presented." (*Id.* at

2.) Defendants point to a notice from the Clerk of Court's office that "sets forth the method of the selection of petit jurors, and the 'properly programmed electronic data processing system for pure randomized selection' that is utilized." (*Id.* (citing 139-1).) Defendants argue that Plaintiff's claims on this point are unfounded. (*Id.*)

Next, Defendants turn to Plaintiff's claim that "because the prospective juror did not disclose her previous bankruptcy proceeding, [] the Plaintiff was somehow prejudiced in her ability to assess this potential juror due to this non-disclosure." (*Id.*) Defendants point out that "being a debtor in a bankruptcy proceeding would not have been a basis for a 'for cause' strike of a prospective juror[.]" (*Id.*) They also note that Plaintiff "is apparently objecting that she did not have the opportunity for an 'all-white' jury by peremptorily striking the only black juror." (*Id.*) In addition, Defendants argue, the information of this juror's bankruptcy proceedings was "available for the Plaintiff at any time prior to the verdict in this case (the names of the jurors were provided to counsel before *voir dire* even began)." (*Id.* at 2–3 (emphasis omitted).) Defendants note that there was "an entire day after the jury was selected and prior to presenting evidence where this information could have been obtained[.]" (*Id.* at 3.) They argue that had the Court "deemed this non-disclosure sufficient grounds to remove the juror, the case would have proceeded with the seven (7) remaining jurors[,]" which, Defendants argue, would have made no difference in the unanimous verdict. (*Id.* (emphasis omitted).)

As to Plaintiff's argument "that there were 'improper' references to Medicaid in Dr. Joe Jackson's deposition (which was read to the jury as part of the Defendants' case)[,]" Defendants point out that Plaintiff had multiple opportunities to object to these inclusions—but did not do so. (*Id.*) As per the Court's order, Plaintiff was provided with the redacted deposition prior to trial and did not object to any of the references to Medicaid. (*Id.*) Nor did she do so at trial. (*Id.*) In addition,

Defendants assert that "the references to Medicaid had nothing to do with the Plaintiff's post-accident medical treatment (or ability to pay [or have someone else to pay for her treatment]), but whether the Plaintiff would have had an MRI in 2011." (*Id.*) They argue further that in Louisiana, "there is no prohibition to a jury knowing that a plaintiff is a Medicaid beneficiary[.]" (*Id.*) As a last note on this point, they argue that "there is no evidence of prejudice to the Plaintiff as the jury awarded 100% of her claimed past medical expenses in its verdict." (*Id.* at 3–4.)

Finally, Defendants turn to Plaintiff's argument "that the jury erred in its determination of comparative fault and the assessment of fault on her." (*Id.* at 4.) Defendants argue that Plaintiff misunderstands "the law regarding the presumption of fault on a following motorist[.]" (*Id.*) Defendants note that Plaintiff objected multiple times "to an instruction for sudden emergency/comparative fault being given to the jury." (*Id.*) The Court ruled that "there was sufficient evidence presented that would allow a jury to consider sudden emergency and allocate comparative fault." (*Id.*) Defendants argue that the jury chose to believe the statement of Plaintiff herself "to the officer at the scene (as well as to a number of her medical providers) as to how the accident happened[.]" (*Id.*) As a result, Defendants contend, "there was more than sufficient evidence before the jury for them to apportion fault to the Plaintiff and they were reasonable in doing so." (*Id.*) Defendants argue that there was no error, "much less 'prejudicial' error, which would provide basis for a new trial[,]" and that "[t]he fact that the Plaintiff did not like or agree with the outcome of the trial does not make it 'unfair' warranting a new trial." (*Id.* at 5.) Defendants ask the Court to not only deny Plaintiff's motion but to impose sanctions. (*Id.* at 5–6.)

       *c.*      *Plaintiff's Reply* (Doc. 141)

In reply, Plaintiff argues that she may have been able to look into jurors as soon as she received their names, but she "had no reason to suspect any inordinate behavior by any prospective

juror . . . until the Jury Verdict was read by the Court . . . and [questions] arose first in the form of the Jury Foreperson." (Doc. 141 at 1–2.) She contends that if the foreperson had been removed, the verdict may have been different because of "the dynamics of the Jury deliberations[.]" (*Id.* at 2.) Plaintiff then again attempts to relitigate the case and claims that she is "asking the Judge to substitute his Judgement based on the Evidence from any fact finding at trial that was <u>NOT</u> based on the Evidence." (*Id.* at 2–3.)

### B.     Legal Standards

The Federal Rules of Civil Procedure provide that the Court "may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Under Rule 59, a new trial may be granted if 'the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course.'" *Gaddy v. Taylor Seidenbach, Inc.*, 446 F. Supp. 3d 140, 149 (E.D. La. 2020) (quoting *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted)) (citing *McFadden v. Wal-Mart Stores*, No. 04-2547, 2006 WL 3087164, at *2 (E.D. La. Oct. 27, 2006)). "A district court, however, should attempt to avoid substituting its judgment for the jury's considered verdict, so as to not violate the parties' Seventh Amendment rights." *Id.* (internal quotation marks omitted) (quoting *Sorina v. Avis Rent-A-Car Sys., Inc.*, No. 90-2967, 1992 WL 40840, at *1 (E.D. La. Feb. 20, 1992)) (citing *Wright v. Nat'l Interstate Ins. Co.*, No. 16-16214, 2018 WL 2017567, at *3 (E.D. La. May 1, 2018), *aff'd*, 762 F. App'x 201 (5th Cir. 2019)).

### C.     Analysis

Most seriously, Plaintiff argues that people of color were improperly excluded from jury service. (Doc. 133-1 at 1.) She argues both that the only Black member of the jury withheld

relevant information, (*id.* at 3), an argument which the Court will address below, and that the panel was not representative of the racial makeup of East Baton Rouge Parish, (*id.* at 4). Plaintiff points to *Duren v. Missouri*, in which the Supreme Court emphasized "that 'jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.'" *Duren*, 439 U.S. 357, 363–64 (1979) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). While *Duren* dealt with a criminal trial—and indeed, much of the case law on racial bias in jury selections focuses on criminal trials—the Supreme Court has stated that "discrimination on the basis of race in selecting a jury in a civil proceeding harms the excluded juror no less than discrimination in a criminal trial." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991). To make a prima facie showing "that the jury venires were not selected from a fair cross-section of the community[,]" Plaintiff must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *United States v. Sanders*, 133 F.4th 341, 372 (5th Cir. 2025) (internal quotation marks omitted) (quoting *Duren*, 439 U.S. at 364).

Plaintiff argues only that "[i]n the panel for potential jurors, only four persons of color out of twenty-eight persons appeared." (Doc. 133-1 at 4.) As the Court informed the parties at the time, it uses "a two-step process to select jurors." (Doc. 139-1 at 1.) First, it creates a "master jury wheel . . . every two years following general elections by selecting names at random from Louisiana voter registration lists and licensed drivers/identification card holder lists who are U.S. Citizens and over 18 years of age from each parish in this district." (*Id.*) "Then, names are randomly drawn

periodically from the master jury wheel to receive juror qualification questionnaires[,]" the answers to which determine whether individuals "are legally qualified to serve." (*Id.*) Those legally qualified to serve "are put on a second wheel, a qualified jury wheel." (*Id.*) When a panel is needed for a trial or grand jury, "juror summonses are sent to persons randomly selected from the qualified wheel." (*Id.*) In addition, the Court uses "a properly programmed electronic data processing system for pure randomized selection." (*Id.*) Any number of factors, therefore, can contribute to the makeup of a panel, including voter registration, whether a person has a driver's license or an identification card, legal qualifications to serve, and the randomness inherent in each wheel. Furthermore, the Court has no control over which of the persons called for jury service actually appear. Plaintiff's evidence on this ground is merely the overall racial makeup of East Baton Rouge Parish, which does not speak to the racial makeup of those registered to vote or in possession of legal identification, or those legally qualified to serve as jurors. (*See* Doc. 133-1 at 4.) Consequently, Plaintiff has not shown "underrepresentation [] due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364.

Plaintiff has not demonstrated that a new trial has ever been granted in federal court due to a juror's failing to disclose a prior bankruptcy. She points to *McDonough Power Equip., Inc., v. Greenwood*, in which the Supreme Court stated: "To invalidate the result of a [three-week] trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *McDonough*, 464 U.S. 548, 555 (1984). The holding in *McDonough* is, in other words, precisely the opposite of what Plaintiff asserts: The Supreme Court held that "[t]he Court of Appeals was mistaken in deciding as it did that respondents were entitled to a new trial." *Id.* at 556.

16

The Court's standard *voir dire* asks: "Has anyone in the jury panel been a party to a lawsuit, either as the plaintiff (the party bringing the claim) or the defendant (the party against whom the claim has been made)?" (Standard Voir Dire Questions for Civil Jury Trials, https://www.lamd.uscourts.gov/content/judge-john-w-degravelles (last visited Nov. 14, 2025).) It does not inquire about bankruptcy proceedings. (*See id.*) Bankruptcy petitions typically do not use the terms "lawsuit," "plaintiff," or "defendant" but instead use "bankruptcy" or "petition," "debtor," and "creditor." (*See* Doc. 133-2.) For a nonlawyer, the question of whether to include a bankruptcy when asked about lawsuits would potentially be confusing given this different terminology. At most, this is "a juror's mistaken, though honest response to a question," which will not lead the Court to invalidate the result of this trial. *See McDonough*, 464 U.S. at 555.

In any case, Plaintiff has not shown that she was prejudiced. Plaintiff argues that this information was relevant because of "the juror's failure to disclose money issues[.]" (Doc. 133-1 at 4.) But the Court's standard *voir dire* does not include broad questions about "money issues," nor did Plaintiff seek *voir dire* on financial difficulties or bankruptcies. (*See* Doc. 87.) Plaintiff sought *voir dire* on lawsuits related to insurance companies, "collection letter[s] or overdue notice[s] for a medical bill that [one's] insurance company was supposed to pay," and finances related to insurance companies. (Doc. 87 at 3–5.) The Court does not require jurors to volunteer un-asked-for information, nor does it require jurors to read the minds of counsel. To do so would be "to insist on something closer to perfection than our judicial system can be expected to give[]"— or indeed, than any person can be expected to give. *McDonough*, 464 U.S. at 555.

Next, the Court looks to Plaintiff's argument that inadmissible evidence was introduced. (Doc. 133-1 at 4.) Plaintiff asserts that evidence of her enrollment in Medicaid was introduced, which she claims was subject to the collateral source rule. (*Id.*) Defendants note correctly that

Plaintiff did not object to this reference to Medicaid prior to trial, at trial, or at any point prior to this filing. (Doc. 139 at 3.) Furthermore, the references to Medicaid had to do with an MRI in 2011, not Plaintiff's medical treatment following this accident. (*Id.*)

The Louisiana Civil Code of Evidence states that "[i]n a civil case, evidence of furnishing or offering or promising to pay expenses or losses occasioned by an injury to person or damage to property is not admissible to prove liability for the injury or damage nor is it admissible to mitigate, reduce, or avoid liability therefor." La. Code Evid. Ann. art. 409. It adds, "This Article does not require the exclusion of such evidence when it is offered solely for another purpose, such as to enforce a contract for payment." *Id.* "The collateral source rule precludes evidence of payments received from an independent source from admission at trial against the tortfeasor to mitigate, reduce, or avoid liability." *Thomassie v. Amedisys LA Acquisitions, LLC*, 2020-01229 (La. 1/20/21), 308 So. 3d 1165, 1165 (citing *Bozeman v. State*, 2003-1016 (La. 7/2/04) 879 So. 2d 692, 698; La. Code Evid. Ann. art. 409). The Louisiana Supreme Court has "rejected a traditional application of the collateral source rule in favor of a rule more narrowly tailored to better conform with the compensatory goal of tort recovery." *Bellard v. Am. Cent. Ins. Co.*, 2007-1335 (La. 4/18/08), 980 So. 2d 654, 669. It "reasoned that whether the collateral source rule applies depends to a certain extent upon whether the victim has procured the collateral benefits for himself or has in some manner sustained a diminution in his or her patrimony in order to secure the collateral benefits such that he or she is not merely reaping a windfall or double recovery." *Id.* Plaintiff has made no arguments regarding this question—not prior to trial, at trial, or in this motion. (*See* Doc. 133-1 at 4.) She has not, therefore, shown that she is entitled to a new trial on this ground.

Plaintiff's remaining arguments are, largely, that she disagrees with the jury's verdict. (*Id.* at 7–10.) On a Rule 59(a) motion, it is not the role of the Court to "substitute[e] its judgment for

the jury's considered verdict[.]" *Gaddy*, 446 F. Supp. 3d at 149 (cleaned up). After Plaintiff rested, Defendant moved for judgment as a matter of law under Rule 50. (Doc. 121.) The Court denied it. (*Id.*) The Court has repeatedly found that there are questions in this matter best decided by a jury, denying both this motion from Defendants and Plaintiff's motion for summary judgment in 2019. (Doc. 15.) In a jury trial, the Court is not the finder of fact—the jury is. The jury here deliberated for approximately two hours. (Doc. 121 at 2.) At the end of its deliberations, the jury decided that Plaintiff was 45% at fault and Defendant Bradshaw was 55% at fault. (Doc. 124 at 2.) It did so after hearing testimony from both Plaintiff and Defendant Bradshaw, as well as a number of witnesses. (*See* Docs. 117, 118, 120, 121.)

As Plaintiff herself noted, the Court instructed the jury that "the law has established a rebuttable presumption that a following motorist who strikes a preceding motorist from the rear has breached the standard of conduct prescribed by Louisiana Revised Statute Sect. 32:81(A) and is therefore liable for the accident." (Doc. 131 at 2 (emphasis omitted).) The jury was free to decide that Defendant had rebutted that presumption in whole or in part and apportion liability accordingly. The jury found Defendant to have been negligent and 55% at fault. The jury chose to apportion liability according to the testimony it believed. Plaintiff has not presented the Court with any reason to rule that the verdict was against the weight of the evidence; instead, she merely that disagrees with the jury's assessment of the evidence presented. (Doc. 133-1 at 2, 7–9.)

"If the jury's verdict is 'clearly within the universe of possible awards which are supported by the evidence,' the district court should not grant a new trial." *Gaddy*, 446 F. Supp. 3d at 149 (quoting *Narcisse v. Ill. Cent. Gulf R. Co.*, 620 F.2d 544, 547 (5th Cir. 1980)). "A district court should not interfere with the factfinder's award of damages unless it is in an amount that 'shock[s] the judicial conscience and . . . raise[s] an irresistible inference that passion, prejudice, corruption

or other improper cause invaded the trial.'" *Id.* (quoting *Munn v. Algee*, 924 F.2d 568, 578 (5th Cir. 1991)). The jury's verdict that Defendant was 55% at fault was clearly within universe of possibilities. It awarded Plaintiff $236,017.93, which once reduced by the liability/fault apportioned to Plaintiff, was $129,809.96. This was also clearly within the universe of possible awards, given that Plaintiff herself agreed to a high/low agreement that contemplated the possibility of a low award below $150,000.00. (Doc. 131-2 at 1.)

Specifically, Plaintiff asserts that "[n]o future medical expenses were awarded[,]" which she claims is an error. (Doc. 133-1 at 8.) She asserts—without citing to any record evidence—that she is in need of "continuing treatment from her neck injury which is new" and "her lower back which is exacerbated." (*Id.*) But Defendants argue that "Plaintiff had an extensive pre-accident history for both her neck and back and had been actively treating with a pain management doctor in Mississippi (Dr. Joseph Jackson) for <u>years</u> prior to the accident for ongoing cervical and lumbar complaints." (Doc. 109 at 3.) Dr. Jackson's deposition testimony was read at trial. (Doc. 121 at 1.) Numerous other witnesses also testified as to Plaintiff's medical treatment. (Docs. 118, 120.) Again, the jury was free to believe whatever admissible testimony it found most credible. The jury could have reasonably found that any future treatment for Plaintiff's neck and lower back was not due to the accident but to pre-existing injuries and therefore declined to award damages for future medical expenses. Since this is within the universe of possible awards, the Court will not interfere with the jury's award of damages. *See Gaddy*, 446 F. Supp. 3d at 149.

Plaintiff has given the Court no reason to vacate the jury's verdict and award of damages.

## IV.  SANCTIONS

Defendants seek sanctions against Plaintiff and her counsel in both their opposition to her *Motion for Declaratory Judgment* and their opposition to her *Motion for New Trial*. (Docs. 139,

20

140.) However, Defendants provide no legal basis for their request for sanctions. If this is a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure, then it "must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Fed. R. Civ. P. 11(c)(2). Accordingly, Defendants' request for sanctions is denied.

## V.    MOTION TO INTERVENE (DOC. 156)

### A.    Parties' Arguments

#### a.    *Bayou Medical Management's Motion to Intervene* (Doc. 156)

Bayou Medical Management argues that it has "a justifiable interest in the principal action and, as such, names all parties therein as Defendants-in-Intervention, namely, Kimberlana Elkins, Joe Edward Bradshaw, and GEICO Casualty Insurance Company." (Doc. 156 at ¶ 2.) It asserts that it "is a preferred provider organization that facilitates the provision of medical services to individuals through a network of healthcare providers, hospitals, and facilities contracted by BMM PPO." (*Id.* at ¶ 3.) Bayou Medical Management claims that it entered into an agreement with Plaintiff Elkins to pay her providers for their medical services related to this accident. (*Id.* at ¶¶ 4–5.) As part of this agreement, it asserts, she assigned Bayou Medical Management her interest in the proceeds from this suit. (*Id.* at ¶ 5.) Bayou Medical Management claims that "[t]he treatment facilitated" following Plaintiff's accident "through BMM PPO's provider and facility totals $140,764.15" as of March 3, 2023. (*Id.* at ¶ 16.) It "consequently makes a claim against the funds which may be recovered by Plaintiff, Kimberlana Elkins, and/or deposited into the registry of the Court in the full sum of $140,764.15." (*Id.* at ¶ 17.) It asks the Court to grant its motion to intervene and award it the $140,764.15, "plus legal interest from the date of deposit, for the medical bills of Kimberlana Elkins[,]" as well as "any future medical costs incurred by Kimberlana Elkins, which

are related to the accident at issue in this matter and facilitated through BMM PPO, LLC[,]" and "[f]or all just and equitable relief, and for all costs of this proceeding." (*Id.* at ¶ 18.)

        *b.*     *Defendants' Opposition to Motion to Intervene* (Doc. 150)

Defendant GEICO argues that the Court should not address the motion to intervene until it has disposed of the motion for declaratory judgment and the motion for new trial. (Doc. 150 at 1.) It contends that "this matter is 'closed' such that there appears to be a procedural impediment to the instant Motion," and it argues that if the Court were to deny those two motions—as it now has—"there will be no matter into which to intervene[.]" (*Id.*)

**B.**    **Legal Standards**

Rule 24 of the Federal Rules of Civil Procedure provides that the Court "must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24. The Fifth Circuit has explained that a motion under this rule "is proper when: '(1) the motion to intervene is timely; (2) the potential intervener (sic) asserts an interest that is related to the property or transaction that forms the basis of the controversy in the case into which she seeks to intervene; (3) the disposition of that case may impair or impede the potential intervener's ability to protect her interest; and (4) the existing parties do not adequately represent the potential intervener's interest.'" *Ross v. Marshall*, 426 F.3d 745, 753 (5th Cir. 2005) (quoting *Saldano v. Roach*, 363 F.3d 545, 551 (5th Cir. 2004)). "A movant must show that she satisfies each factor of the above test to be entitled to intervene." *Guenther v. BP Ret. Accumulation Plan*, 50 F.4th 536, 542–43 (5th Cir. 2022) (citing *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015)). "Intervention should generally be allowed where 'no one would be hurt and greater

22

justice could be attained.'" *Ross*, 426 F.3d at 753 (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994)). However, "[t]he intervention rule is intended to prevent multiple lawsuits where common questions of law or fact are involved but is not intended to allow the creation of whole new lawsuits by the intervenors." *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 525 (5th Cir. 1994).

### C.    Analysis

#### a.    Timeliness

The Fifth Circuit "has identified four factors, sometimes referred to as the *Stallworth* factors, to determine whether a motion to intervene is timely: the length of time the movant waited to file, the prejudice to the existing parties from any delay, the prejudice to the movant if intervention is denied, and any unusual circumstances." *Rostain v. Mendez*, 986 F.3d 931, 937 (5th Cir. 2021) (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977)). The Fifth Circuit has found that "intervention could be allowed post-judgment provided that the rights of existing parties were not prejudiced and intervention did not interfere with the orderly processes of the court." *Ross*, 426 F.3d at 754 (citing *Stallworth*, 558 F.2d at 266). It has stated that where a party "sought to intervene for the limited purpose of protecting its subrogation interest in a fund which had not yet been distributed, we cannot conclude that the motion to intervene was untimely merely because it came a few hours after the entry of judgment." *McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1072 (5th Cir. 1970); *see also McClenny Moseley & Assocs., P.L.L.C. v. Equal Access Just. Fund. L.P.*, No. 23-30670, 2024 WL 2874371 (5th Cir. June 7, 2024) (finding that a petition filed within thirteen days of a relevant district court order was timely).

This, however, was not a motion to intervene filed a few hours or days after the entry of judgment. Bayou Medical Management did not file this motion to intervene until March 2023, (Docs. 148, 156)—approximately sixteen months after the judgment in this case, (Doc. 129), and

over four years after the case was first filed, (Doc. 1). Plaintiff assigned her interests in the proceeds from this claim or lawsuit to Bayou Medical Management in March 2018, at which time she also informed Bayou Medical Management of the instant suit. (Doc. 170-2 at 3.) Given this timeline, it is difficult for the Court to find this intervention timely. The Court will acknowledge that it is unlikely that there is any prejudice to Defendants as a result of the delay, but because Bayou Medical Management requests interest, the delay does prejudice Plaintiff.

As to prejudice to Bayou Medical Management: This assignment of rights is, in essence, a contract between Bayou Medical Management and Plaintiff, and should Plaintiff fail to abide by the terms of the contract, Bayou Medical Management can certainly pursue legal action against Plaintiff. Its rights are not reliant on this intervention. On the other hand, allowing an intervention that would force the Court to decide contractual disputes involving a new party seven years into a motor vehicle personal injury case and four years after a jury verdict in that case would "interfere with the orderly processes of the court." *Ross*, 426 F.3d at 754 (citing *Stallworth*, 558 F.2d at 266). The Court finds the intervention was not timely filed.

    b.    *Interest in Property or Transaction*

Next, in determining whether the potential intervenor "asserts an interest that is related to the property or transaction that forms the basis of the controversy in the case into which she seeks to intervene[,]" *Ross*, 426 F.3d at 753 (quoting *Saldano*, 363 F.3d at 551), the Court emphasizes that a jury verdict and judgment were reached in this matter in October 2021 , (Docs. 124, 129). Bayou Medical Management asserts an interest in the funds awarded by the jury. (Doc. 156 at 4.) Had this been a timely intervention, its interest would have been related to the property or transaction at issue.

### c.     Ability to Protect Interests

The Court does not, however, find that "the disposition of [this] case may impair or impede the potential intervener's ability to protect her interest[,]" *Ross*, 426 F.3d at 753, because, again, this case was disposed of four years ago, (Docs. 124, 129). Plaintiff's attempts to revive her case play no role in Bayou Medical Management's motion. (*See* Doc. 156.) Even if they did, Bayou Medical Management could protect its interests equally well with a suit to enforce any breach of contract on the part of Plaintiff.

### d.     Adequate Existing Representation of Interests

Finally, with respect to the question of whether the existing parties adequately represent Bayou Medical Management's interest: Bayou Medical Management's interest is in the "funds recovered by or on behalf of Plaintiff, Kimberlana Elkins, in connection with her claim against the defendants to this matter." (Doc. 156 at ¶ 1.) When there were questions of liability and damages pending between Plaintiff Elkins and Defendants, Plaintiff Elkins adequately represented Bayou Medical Management's interests; it was in the interest of both to pursue the largest feasible damages award to Plaintiff. Now, Bayou Medical Management seeks to recover some portion of those funds, raising new claims with new questions of law and fact, in which Plaintiff may not adequately represent its interests.

Bayou Medical Management seeks, in essence, to graft a contractual claim against Plaintiff Elkins onto this case, in which the jury reached a verdict nearly four years ago. Because Bayou Medical Management's *Motion to Intervene* is far from timely, because Plaintiff adequately represented its interests in the initial suit, and because Bayou Medical Management is able to protect its interests in this new controversy equally well with an independent suit against Plaintiff

Elkins for any breach of contract should the need arise, the Court denies Bayou Medical Management's *Motion to Intervene*.

## VI.    MOTION TO ENFORCE SETTLEMENT (DOC. 168)

Finally, the Court turns to Defendant GEICO's *Motion to Enforce Settlement* (Doc. 168).

### A.    Parties' Arguments

#### a.    *Defendant GEICO's Motion to Enforce Settlement* (Doc. 168)

Defendant GEICO asks the Court to enforce the high/low settlement agreement, noting that after the jury returned its verdict and the Court signed the judgment, "counsel for Defendants sent the settlement proceeds for $150,000.00 and a satisfaction of judgment to counsel for the Plaintiff, which was refused." (Doc. 168-1 at 2.) Instead, Defendant GEICO argues, Plaintiff filed the motions for declaratory judgment and for new trial (Docs. 131, 133), which GEICO opposed (Docs. 139, 140). (Doc. 168-1 at 2.) GEICO asserts that it "has patiently waited for the Plaintiff to evidence her willingness to accept the settlement proceeds; however, to date, she has not done so." (*Id.* at 3.) It argues that it filed this motion to enforce the settlement "in the interest of bringing finality to this matter[.]" (*Id.*)

GEICO argues that the Court has jurisdiction over this matter due to Bayou Medical Management's motion to intervene, (*id.* at 4), and that Louisiana law should apply to the Court's analysis of the enforceability of the settlement, (*id.* at 5).

#### b.    *Plaintiff's Opposition to Motion to Enforce Settlement* (Doc. 171)

In her *Opposition*, Plaintiff reiterates many of her arguments from her earlier motions. (Doc. 171.) She argues that there was no meeting of the minds, objects to Mr. Bradshaw's absence, and asserts that GEICO's motion for a directed verdict—which the Court denied—voided the Agreement. (*Id.* at 1.) While the first two of these were raised in Plaintiff's motion for declaratory

judgment, the third is novel. Plaintiff asserts that GEICO's motion for a directed verdict raised an outcome unforeseen by the Agreement—a non-jury verdict—and therefore voided the Agreement altogether. (*Id.* at 5–8.) Plaintiff argues that the request by defense counsel for a directed verdict constituted fraud. (*Id.* at 8.) She also briefly argues that under the terms of the Agreement, GEICO must pay the $236,017.93 awarded by the jury before the allocation of fault. (*Id.*)

> ### c.    *Bayou Medical Management's Opposition to Motion to Enforce Settlement* (Doc. 170)

Bayou Medical Management argues only that the *Motion to Enforce* "is premature" given Plaintiff's *Motion for Declaratory Judgment* and *Motion for New Trial*. (Doc. 170 at 3.) It argues that its rights are not affected by the Agreement (which Plaintiff entered into over a year before Bayou Medical Management's *Motion to Intervene*, (*see* Doc. 131-2; Doc. 148)), and continues to assert its rights to the funds in question, (Doc. 170 at 3–4). It also notes that "[s]hould the alleged settlement amount of $150,000 not cover the amount owed to BMM PPO, BMM PPO's rights against Plaintiff to recover full payment shall remain." (*Id.* at 5.)

> ### d.    *Defendant GEICO's Reply* (Doc. 174)

Defendant GEICO argues that Bayou Medical Management's opposition here is, essentially, irrelevant since it "is not a party to the agreement." (Doc. 174 at 2.) It maintains that Plaintiff's arguments are contrary to facts, law, and common sense. (*Id.* at 3.) As such, GEICO requests that the Court grant the *Motion to Enforce Settlement*. (*Id.* at 5.)

### B.    Legal Standards

"A court may summarily enforce a settlement agreement when it has retained jurisdiction." *Cavalier v. State of Louisiana: Dep't of Pub. Safety*, No. 21-656, 2023 WL 3594155, at *2 (M.D. La. Feb. 24, 2023) (citing *Richardson v. Famous Bourbon Mgmt. Grp., Inc.*, 857 F. App'x 182, 183–84 (5th Cir. 2021)).

"Louisiana jurisprudence has a 'strong policy favoring compromise agreements and finality of settlements.'" *Thompson*, 377 So. 3d at 920 (quoting *Brown*, 630 So. 2d at 757). The law "does not sanction the solemn acts of contending parties settling their disagreements being lightly brushed aside, unless there be present evidence of bad faith, error, fraud, etc." *Id.* (quoting *Beck*, 145 So. at 811).

### C.     Analysis

Here, the parties expressly did not waive the right to "post judgment relief . . . to enforce this agreement[,]" showing that they contemplated the Court enforcing the Agreement. (Doc. 131-2 at 2.) And indeed, courts have distinguished settlement agreements that result in the dismissal of claims, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994), from the type of high/low agreement that is not intended to fully terminate the case but instead still relies on the actions of the jury or the court, *see Tuepker v. State Farm Fire & Cas. Co.*, 507 F.3d 346, 357 (5th Cir. 2007) (high/low agreement based on the outcome of appeals); *Thrapp v. Armstrong World Indus., Inc.*, 767 F. Supp. 822, 822–23 (N.D. Tex. 1991) (high/low agreement in state court based on outcome of jury trial did not constitute final settlement against in-state defendants to allow removal); *Cameron v. Werner Enters.*, No. 13-243, 2016 WL 660940, at *2 (S.D. Miss. Feb. 18, 2016) (high/low agreement based on outcome of trial was not enforceable by a non-party, but court did not reject jurisdiction); *Admiral Ins. Co. v. Arrowood Indem. Co.*, 471 B.R. 687, 695 (N.D. Tex. 2012) (high/low agreement based on outcome of summary judgment motion); *Boudreaux v. Transocean Deepwater, Inc.*, 641 F. App'x 328, 331 (5th Cir. 2016) (high/low agreement based on outcome of summary judgment motion and subsequent appeals). Courts have generally not hesitated to enforce high/low agreements such as these. *See Boudreaux*, 641 F. App'x at 331, 335 (remanding but still finding the high/low agreement enforceable by the district court).

The Court finds that, unlike the type of settlement agreement that dismisses a case pursuant to Rule 41(a)(1)(ii), this high/low agreement did not contemplate a dismissal of all claims. (*See* Doc. 131-2.) It instead required that Defendant GEICO pay Plaintiff a sum of $150,000.00 to $1,400,000.00, depending on the jury's verdict and award. (*Id.* at 1.) In exchange, both parties would waive certain rights. (*Id.* at 1–2.) However, they would *not* waive "the right to enforce this agreement." (*Id.* at 2.) The Court finds that the parties contemplated and contracted for the enforcement of the high/low agreement as the only non-waived post-judgment relief, in this Court or on appeal. (*See id.*) As a result, the Court has jurisdiction to enforce the high/low agreement.

The Court has previously found Plaintiff's first two arguments against enforcing the Agreement to be without merit. Plaintiff has not raised any new meritorious arguments here. With respect to her third argument—that Defendant's motion for directed verdict voided the Agreement—the Court looks to the terms of the Agreement: "The parties have agreed to a high/low agreement regarding the verdict of the jury in the trial of this matter." (Doc. 131-2 at 1.) They set a high, "which will apply to any verdict above $1,400,000.00," of $1,400,000.00. (*Id.*) They set a low, "which will apply to any verdict under $150,000.00," of $150,000.00. (*Id.*) They waived rights to appeal, motions for new trial, JNOV, additur/remittitur, and post-judgment relief other than the right to enforce the Agreement. (*Id.* at 2.) They did not waive the right to pursue motions for directed verdicts. (*See id.* at 1–2.) Louisiana Civil Code provides that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. This language is clear, explicit, and unambiguous: The parties contracted away the uncertainty inherent in the range of awards that could result from a jury verdict, and in exchange, they waived their rights to certain post-judgment relief. (*See* Doc. 131-2 at 1–2.) Because this contract is clear, explicit, and leads to no absurd

consequences, it is not this Court's role to attempt to peer into the parties' minds for what their intent may or may not have been when they formed this contract on October 22, 2021. Instead, it is the Court's role to enforce the Agreement as written.

In addition, Plaintiff's claim that she is owed the full $236,017.93 ignores the jury's actual verdict, which apportioned 55% of the fault to Defendant Bradshaw and 45% to Plaintiff Elkins. (Doc. 124 at 2.) Here, the jury did as instructed: They did "not make any actual monetary reduction in the figure [they] reach[ed] based on the percentages of fault," but rather allowed the Court to "make the appropriate reduction" (i.e., 45%). (*Id.* at 3.) In the Judgment, the Court did the math, resulting in the award of $129,809.96. (Doc. 129 at 2.) Plaintiff's argument is unavailing.

Finally, the Court notes that Bayou Medical Management's contention that it maintains claims against Plaintiff regardless of the Court's determination on this matter simply supports the Court's denial of Bayou Medical Management's *Motion to Intervene*. (Doc. 170 at 3–5.) Bayou Medical Management's interests do not rely upon the outcome of this matter. They are best pursued independently of this action.

VII.  CONCLUSION

Accordingly,

**IT IS ORDERED** that 1) the *Motion To For [sic] Declaratory Judgment* (Doc. 131) filed by Plaintiff Kimberlana Elkins is **DENIED**; 2) *Plaintiff's Alternative Motion for Relief from Jury Verdict for New Trial Pursuant to FRCP 59(a)* (Doc. 133) is likewise **DENIED**; 3) Bayou Medical Management's *Motion to Intervene on Behalf of Bayou Medical Management, Preferred Provider Organization, LLC* (Doc. 148-2) is also **DENIED**; and 4) the *Motion to Enforce Settlement* (Doc. 168) filed by Defendant GEICO Casualty Company is **GRANTED**. However, Defendant GEICO's request for sanctions is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>November 14, 2025</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

31